## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| PATTI DELVALLE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN MASTER PRODUCTS, INC., D/B/A JERRY BAKER,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Patti DelValle ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

### INTRODUCTION

1.     Defendant American Master Products, Inc., d/b/a Jerry Baker ("Jerry Baker") rented, exchanged, and/or otherwise disclosed, from within the State of Michigan, detailed information about Plaintiff's *Grandma Putt's Green Thumb Magic* book purchase to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed her information to aggressive

advertisers, political organizations, and non-profit companies.  As a result, Plaintiff has received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Plaintiff's Personal Reading Information (defined below) during the relevant pre-July 30, 2016 time period[1], from within the State of Michigan, Jerry Baker violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

2.      Documented evidence confirms these facts.  For example, a list broker, NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "JERRY BAKER BOOK BUYERS MASTERFILE Mailing List", which contains the Personal Reading Information of 220,541 of Jerry Baker's book purchasers at a base price of "$110.00/M [per thousand]," (*i.e.*, 11 cents apiece), as

---

[1]      The statutory period for this action is six years. *See* M.C.L. § 600.5813.

[2]      In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

shown in the screenshot below:



*See* **Exhibit A** hereto.

3.      By renting, exchanging, or otherwise disclosing the Personal Reading

Information of its based book purchasers during the relevant pre-July 30, 2016 time

period, from within the State of Michigan, Jerry Baker violated the PPPA.

Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

4.      Accordingly, Plaintiff brings this Class Action Complaint against Jerry Baker for its intentional and unlawful disclosures of its customers' Personal Reading Information in violation of the PPPA.

## NATURE OF THE CASE

5.      To supplement its revenues, Jerry Baker rents, exchanges, or otherwise discloses its customers' information – including their full names, titles of the books they purchased, and home addresses (collectively "Personal Reading Information"), as well as myriad other categories of individualized data and demographic information such as gender and interests – to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.

6.      By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Personal Reading Information, Jerry Baker is able to disclose the information time and time again to countless third parties.

7.      Jerry Baker's disclosure of Personal Reading Information and other

individualized information is not only unlawful, but also dangerous because it allows for the targeting of particular members of society.

8.     While Jerry Baker profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other individualized information in Michigan, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because Jerry Baker does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

## **PARTIES**

9.     Plaintiff Patti DelValle is a natural person and citizen of the State of Michigan and resides in Ironwood, Michigan.  Plaintiff purchased the book *Grandma Putt's Green Thumb Magic* book during the relevant pre-July 30, 2016 time period.  The book *Grandma Putt's Green Thumb Magic* is published by Jerry Baker.  Plaintiff purchased the book *Grandma Putt's Green Thumb Magic* directly from Jerry Baker, by sending Jerry Baker money to its headquarters in Wixom, Michigan.  Jerry Baker collected the money paid to it by Plaintiff for the book *Grandma Putt's Green Thumb Magic* in Michigan.  Prior to and at the time Plaintiff purchased *Grandma Putt's Green Thumb Magic*, Jerry Baker did not notify Plaintiff that it discloses the Personal Reading Information of its customers, and Plaintiff has never authorized Jerry Baker to do so.  Furthermore, Plaintiff was never provided

any written notice that Jerry Baker rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since purchasing *Grandma Putt's Green Thumb Magic*, and during the relevant pre-July 30, 2016 time period, Jerry Baker disclosed, from within the State of Michigan, and without the requisite consent or prior notice, Plaintiff's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  At all times after Plaintiff purchased the book *Grandma Putt's Green Thumb Magic* but prior to Jerry Baker's disclosure of Plaintiff's Personal Reading Information during the relevant pre-July 30, 2016 time period, Jerry Baker was incorporated in Michigan, headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore in Michigan at the time it was required to, but did not, notify Plaintiff that it would disclose her Personal Reading Information.  Likewise, at all times after Plaintiff purchased the book *Grandma Putt's Green Thumb Magic* but prior to Jerry Baker's disclosure of Plaintiff's Personal Reading Information during the relevant pre-July 30, 2016 time period, Jerry Baker was incorporated in Michigan, headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore physically present in Michigan at the time it was required to, but did not, obtain Plaintiff's consent in Michigan prior to disclosing her Personal Reading

6

Information from its headquarters in Michigan. Moreover, during that same period, and also from its headquarters in Michigan, Jerry Baker rented or exchanged mailing lists containing Plaintiff's Personal Reading Information to third parties seeking to contact Jerry Baker book purchasers, without first obtaining the requisite written consent from Plaintiff or even giving her prior notice of the rentals, exchanges, and/or other disclosures – informed consent which Jerry Baker was likewise required to obtain from Plaintiff while it was incorporated in Michigan, headquartered in Michigan, a citizen of Michigan, and physically present in Michigan (and which would have been received by Jerry Baker at its corporate headquarters in Wixom, Michigan assuming it had been requested by Jerry Baker and provided by Plaintiff). Jerry Baker has retained the money Plaintiff paid for the book *Grandma Putt's Green Thumb Magic* in Michigan, and Plaintiff is informed and believes that such money has been deposited by Jerry Baker into a bank account held at a financial institution located in Michigan.

10. Defendant American Master Products, Inc., d/b/a Jerry Baker is a Michigan corporation with its headquarters and principal place of business in Wixom, Michigan. Jerry Baker does business throughout Michigan and the entire United States. Jerry Baker is the publisher of various gardening, home, and health books, including the book *Grandma Putt's Green Thumb Magic*.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant. The vast majority (at least two-thirds) of proposed Class members reside in a state other than Michigan.

12.    Personal jurisdiction and venue are proper because Defendant is incorporated in Michigan and maintains its corporate headquarters and principal place of business in Wixom, Michigan, within this District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

13.    In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

14.    Recognizing the need to further protect its citizens' privacy rights,

Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

15.   Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

16.   Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy – of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

17.   As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of

movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

18.    Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

19.    Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

20.    Despite the fact that Jerry Baker is incorporated in and maintains its corporate headquarters and principal place of business in Michigan, and is thus a citizen of the State of Michigan, Jerry Baker has disregarded its legal responsibilities under the PPPA by systematically selling, renting, and otherwise disclosing all of its customers' Personal Reading Information from within the State of Michigan.

### *The Private Information Market:*
### *Consumers' Private Information Has Real Value*

21.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson

Swindle remarked that "the digital revolution . . . has given an enormous capacity

to the acts of collecting and transmitting and flowing of information, unlike anything

we've ever seen in our lifetimes . . . [and] individuals are concerned about being

defined by the existing data on themselves."[3]

22.     More than a decade later, Commissioner Swindle's comments ring

truer than ever, as consumer data feeds an information marketplace that supports a

$26 billion dollar per year online advertising industry in the United States.[4]

23.     The FTC has also recognized that consumer data possesses inherent

monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types
> and amount of information collected by businesses, or why
> their information may be commercially valuable. Data is
> currency. The larger the data set, the greater potential for

---

[3]     **Exhibit C**, The Information Marketplace:  Merging and Exchanging
Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at*:
https://www.ftc.gov/sites/default/files/documents/public_events/information-
marketplace-merging-and-exchanging-consumer-data/transcript.pdf   (last   visited
July 30, 2021).

[4]     *See* **Exhibit D**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html (last visited July 30, 2021).

analysis – and profit.[5]

24.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

25.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams – and on and on."[7]

26.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of

---

[5]     **Exhibit E**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at*:
https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

[6]     *See* **Exhibit F**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[7]     **Exhibit G**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at*:
https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N120616S.pdf (last visited July 30, 2021).

information about consumers that are now available."[8]

27.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[9]

28.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[10]

29.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and

---

[8]     **Exhibit H**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at*: http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

[9]     *See* **Exhibit I**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[10]     *Id.*

inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs.    Thus, when companies like Jerry Baker share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[12]

30.    Information disclosures like those made by Jerry Baker are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other

---

[11]    *See* **Exhibit J**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[12]    **Exhibit K**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at*: http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[13]    *Id.*

assets to spend on seemingly attractive offers."[14] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

31.     Thus, information disclosures like Jerry Baker's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

32.     Jerry Baker is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing purchaser information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

33.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[14]     **Exhibit L**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at*:   https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf  (last visited July 30, 2021).

[15]     *See id.*

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

34.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

35.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

36.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

37.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell

---

[16]     *See* **Exhibit M**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[17]     *Id.*

their information themselves.[18]

38.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace:   consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[19]

39.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]

### Jerry Baker Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information

40.     Jerry  Baker  maintains  a  vast  digital  database  comprised  of  its

---

[18]     *See* **Exhibit N**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at*: http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[19]     *See* **Exhibit O**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at*: https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[20]     *See* **Exhibit P**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at*: http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

customers' Personal Reading Information.  Jerry Baker discloses its customers' Personal Reading Information, from its headquarters in Wixom, Michigan,  to data aggregators and appenders, who then supplement that information with additional sensitive private information about each Jerry Baker customer, including his or her gender and interests.  (*See, e.g.*, **Exhibit A**).

41.     Jerry Baker then rents and/or exchanges, also from its corporate headquarters in Wixom, Michigan, its mailing lists—which include its customers' Personal Reading Information identifying which individuals purchased which books, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

42.     Jerry Baker also discloses its customers' Personal Reading Information, again from its corporate headquarters in Wixom, Michigan, to data cooperatives, who in turn give Jerry Baker access to their own mailing list databases, which Jerry Baker receives and then accesses in Michigan.

43.     As a result of Jerry Baker's data compiling and sharing practices – all of which occur in the State of Michigan – companies can purchase and/or obtain mailing lists from Jerry Baker that identify Jerry Baker's customers by their most

18

intimate details such as their gender and interests.  Jerry Baker's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

44.     Jerry Baker does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive information is being rented and exchanged on the open market.

45.     At all times prior to disclosing its customers' Personal Reading Information, including during the relevant pre-July 30, 2016 time period, Jerry Baker was incorporated and headquartered in Michigan, maintained its principal place of business in Michigan, and was physically present in Michigan at the time it was required to, but did not, obtain its customers' informed consent prior to disclosing all of their Personal Reading Information from its headquarters in Michigan.  Moreover, during the relevant pre-July 30, 2016 time period, and also from its headquarters in Michigan, Jerry Baker rented or exchanged mailing lists containing all of its customers' Personal Reading Information to third parties seeking to contact Jerry Baker's book purchasers, without first obtaining any of its customers' written consent or even giving them prior notice of these rentals, exchanges, and/or other disclosures – informed consent which Jerry Baker was likewise required to obtain from its customers while Jerry Baker was incorporated

in and headquartered in, a citizen of, and physically present in Michigan (and which would have been received by Jerry Baker at its corporate headquarters in Wixom, Michigan had it been requested by Jerry Baker and provided by Plaintiff).

46.     Consumers can purchase Jerry Baker's publications through numerous media outlets, including the Internet, telephone, or traditional mail, and by remitting payment to Jerry Baker which is thereafter received by Jerry Baker in Michigan.  Regardless of how the consumer makes a purchase, Jerry Baker has never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre-July 31, 2016 time period, Jerry Baker uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Personal Reading Information from within Michigan.

47.     As a result, Jerry Baker disclosed, from within Michigan, its customers' Personal Reading Information – including the titles of the books they purchased and information concerning their reading habits and preferences, which "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[21] – to anybody willing to pay for it.

---

[21]     **Exhibit Q**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

48.     By and through these actions, Jerry Baker has intentionally disclosed, from within Michigan, all of its customers' Personal Reading Information to third parties without any of their consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff seeks to represent a class defined as all individuals in the United States who, at any point during the relevant pre-July 30, 2016 time period, had their Personal Reading Information disclosed to third parties by Jerry Baker without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

50.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the hundreds of thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the records of Defendant.

51.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Jerry Baker is a "retailer or distributor" of publications (*i.e.*, books); (b) whether Jerry Baker obtained consent before disclosing to third parties Plaintiff's and the Class's

Personal Reading Information; and (c) whether Jerry Baker's disclosure of Plaintiff's and the Class's Personal Reading Information violated the PPPA in Michigan.

52.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

53.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

54.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential

for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSE OF ACTION**
**Violation of Michigan's Preservation of Personal Privacy Act**
**(PPPA § 2)**

55.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

56.     Plaintiff brings this claim individually and on behalf of members of the Class against Jerry Baker.

57.     Jerry Baker oversees the publishing of the book *Grandma Putt's Green Thumb Magic* and all of its other books and other publications from within Michigan.

58.     Jerry Baker oversees the sale of the book *Grandma Putt's Green Thumb Magic* and all of its other books and publications from within Michigan.

59.     Jerry Baker collects the money that its customers pay for its books and publications, including the book *Grandma Putt's Green Thumb Magic*, within Michigan.

60.     Plaintiff is informed and believes, and thereupon alleges, that Jerry

Baker collects in Michigan and thereafter deposits in Michigan the money that it receives from its customers (including from customers who purchased the book *Grandma Putt's Green Thumb Magic* or any of its other books or publications) into bank accounts held at financial institutions in Michigan.

61.     Jerry Baker sends to customers the books and other publications that they have purchased from Michigan, and/or oversees such mailings pertaining to all of its books and other publications from within Michigan.

62.     Jerry Baker interacts and communicates with its customers from its corporate headquarters in Michigan. Jerry Baker has been a citizen of Michigan, incorporated in Michigan, headquartered in Michigan, and physically present in Michigan at all times relevant to this action, including prior to disclosing and at the time it disclosed all of its customers' Personal Reading Information from within Michigan.   Accordingly, prior to disclosing its customers' Personal Reading Information from within Michigan, Jerry Baker could have, from and while present in Michigan, provided notice to its customers to inform them that it would be disclosing their Personal Reading Information, but it failed to do so.  Likewise, prior to disclosing its customers' Personal Reading Information from within Michigan, Jerry Baker could have, from and while present in Michigan, obtained its customers' consent to its disclosures of their Personal Reading Information from within Michigan, but it failed to do so.

63. As a book publisher that sells books to consumers, Jerry Baker is engaged in the business of selling written materials at retail from within Michigan. *See* PPPA § 2.

64. By purchasing the book *Grandma Putt's Green Thumb Magic*, Plaintiff purchased written materials directly from Jerry Baker. *See* PPPA § 2.

65. Because Plaintiff purchased written materials directly from Jerry Baker, she is a "customer" within the meaning of the PPPA. *See* PPPA § 1.

66. At various times during the pre-July 30, 2016 time period, Jerry Baker disclosed Plaintiff's Personal Reading Information, which identified her as having purchased a book from Jerry Baker (namely, *Grandma Putt's Green Thumb Magic*), in at least three ways, all from its corporate headquarters within Michigan.

67. First, Jerry Baker disclosed, from within Michigan, mailing lists containing Plaintiff's Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Jerry Baker in Michigan, which Jerry Baker received in Michigan.

68. Second, Jerry Baker disclosed, from within Michigan, mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn gave Jerry Baker access to their own mailing list databases, which Jerry Baker accessed in Michigan.

69.     Third, Jerry Baker rented and/or exchanged, from within Michigan, its mailing lists containing Plaintiff's Personal Reading Information – enhanced with additional information from data aggregators and appenders – to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work, including without limitation Nextmark.

70.     All of the money that Jerry Baker received from the third parties to whom it disclosed Plaintiff's and the Class's Personal Reading Information was sent to and received by Jerry Baker at its headquarters in Michigan.

71.     Because the mailing lists Jerry Baker disclosed from within Michigan included the additional information from the data aggregators and appenders, the lists were more valuable, and Jerry Baker was able to increase its profits gained from the mailing list rentals and/or exchanges, profits which Jerry Baker received in Michigan.

72.     By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 30, 2016 time period, from within Michigan, Jerry Baker disclosed to persons other than Plaintiff records or information concerning her purchase of written materials from Jerry Baker. *See* PPPA § 2. All of Jerry Baker's records concerning Plaintiff's purchase of written materials that were disclosed by Jerry Baker were, prior to their disclosure, stored by and accessible to Jerry Baker

in its headquarters in Michigan. Accordingly, Jerry Baker's disclosures of Plaintiff's Personal Reading Information originated from within Michigan.

73.    The information Jerry Baker disclosed from its headquarters in Michigan indicates Plaintiff's name and address, as well as the fact that she purchased the book *Grandma Putt's Green Thumb Magic*.  Accordingly, the records or information disclosed by Jerry Baker from within Michigan indicated Plaintiff's identity.  *See* PPPA § 2.

74.    Plaintiff and the members of the Class never consented to Jerry Baker disclosing their Personal Reading Information to anyone.

75.    Worse yet, Plaintiff and the members of the Class did not receive notice before Jerry Baker disclosed their Personal Reading Information to third parties.

76.    Jerry Baker's disclosures of Plaintiff's and the Class's Personal Reading Information during the relevant pre-July 30, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

77.    Jerry Baker's disclosures of Plaintiff's and the Class's Personal Reading Information during the relevant pre-July 30, 2016 time period were not made to collect payment for their purchases.

78.    Jerry Baker's disclosures of Plaintiff's Personal Reading Information during the relevant pre-July 30, 2016 time period originated from within Michigan and were made to data aggregators, data appenders, data cooperatives, direct-mail

advertisers, and organizations soliciting monetary contributions, volunteer work, and votes – all in order to increase Jerry Baker's revenue and profits, which is subject to taxation by the State of Michigan.  Accordingly, Jerry Baker's disclosures of its customers' Personal Reading Information in Michigan were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

79.     By disclosing Plaintiff's and the Class's Personal Reading Information during the relevant pre-July 30, 2016 time period from within Michigan, while it was incorporated in, headquartered in and a citizen of Michigan, Jerry Baker violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits in violation of the PPPA from within Michigan.  *See* PPPA § 2.

80.     As a result of Jerry Baker's unlawful disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA).  On behalf of herself and the Class, Plaintiff seeks: (1) $5,000.00 per Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as

representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act, PPPA;

C.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.    For an award of $5,000 to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.    For prejudgment interest on all amounts awarded; and

F.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: December 22, 2021      Respectfully submitted,


/s/ *E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
William Kalas (P82113)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiff and the Putative Class*